IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| D.P. and A.P., Individually and as Next Friends | § | CIVIL ACTION NO_____ |
| of and JANE DOE, a minor child | § | |
| | § | |
| VS. | § | |
| | § | |
| HOLY SEE (VATICAN CITY STATE), | § | |
| THE ROMAN CATHOLIC CHURCH OF | § | |
| THE ARCHDIOCESE OF GALVESTON- | § | |
| HOUSTON, CARDINAL DANIEL N. DINARDO, | § | |
| HIS PREDECESSORS AND SUCCESSORS, | § | |
| AS ARCHBISHOP OF THE ROMAN | § | SECTION _____ |
| CATHOLIC CHURCH OF THE | § | |
| ARCHDIOCESE OF GALVESTON-HOUSTON | § | MAGISTRATE_____ |

## PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COME NOW **D.P.** and **A.P.**, Individually and as Next Friends of and **JANE DOE**, a minor child, (collectively referred to as "Plaintiffs") and file this *Original Complaint* against Holy See (Vatican City State), The Roman Catholic Church of the Archdiocese of Galveston-Houston, and Cardinal Daniel N. DiNardo, his Predecessors and Successors, as Archbishop of The Roman Catholic Church of the Archdiocese of Galveston-Houston (collectively referred to as "Defendants") for causes of action would show the following:

## I. JURISDICTION AND VENUE

1.  This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1330 (a) because Defendant Holy See is a foreign state not entitled to immunity under 28 U.S.C. §§ 1604-1607.

2.  This Court has jurisdiction over Defendant Holy See under 28 U.S.C. § 1605(a)

because Plaintiffs complain of both the private activities and conduct of Holy See in Texas and throughout the U.S.A. and torts committed by Holy See, its officials and employees in Texas.

3.       Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(a)(2) because all or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the Southern District of Texas.

## II.  PARTIES

4.       Plaintiffs D.P. and A.P. are lawful residents and citizens of the State of Texas.  They are the biological parents of  JANE DOE, a minor child.  Plaintiffs D.P and A.P. were residents of Victoria County, Texas at the time of the alleged sexual abuse and sexual assault of their daughter by Reverend Phi Thanh Nguyen.  D.P. and A.P. and JANE DOE'S identities are known or will be made known to Defendants.

5.       JANE DOE is a child who is using a pseudonym to protect her identity as a victim of sexual abuse pursuant to *Texas Civil Practice and Remedies Code, § 33.013*(2009).  Her identity is known or will be made known to Defendants.  JANE DOE was a resident of Victoria County, Texas at the time of the sexual abuse and sexual assault she suffered at the hands of Reverend Phi Thanh Nguyen.

6.       Defendant Holy See (Vatican City State) is the sovereign nation located in Rome, Italy and the ecclesiastical, governmental, and administrative capital of the Roman Catholic Church. Holy See may be served with process by and through its Secretary for Relations with States (Foreign Minister), Archbishop Paul Gallagher, Apostolic Palace 00120 Vatican City State.

7.       Defendant The Roman Catholic Church of the Archdiocese of Galveston-Houston

("Archdiocese of Galveston-Houston" or "Archdiocese") is a division of Defendant Holy See's business and private enterprise that was previously designated as The Roman Catholic Diocese of Galveston-Houston ("Diocese of Galveston-Houston" or "Diocese").  The Archdiocese is the center of control and oversight for the Holy See's ecclesiastical metropolitan territory of Galveston-Houston ("Galveston-Houston Metropolitan District") that includes the counties of Austin, Brazoria, Fort Bend, Galveston, Grimes, Harris, Montgomery, San Jacinto, Walker and Waller in the State of Texas.  The Archdiocese has control and oversight for all of the vicariates and deaneries and seminaries created by the Holy See within the Galveston-Houston Metropolitan District, including the St. Mary's Seminary in Houston, Texas.  The governing official of The Archdiocese of Galveston-Houston is its Archbishop who is duly appointed, authorized and employed by Defendant Holy See to govern and control both the Archdiocese and the Galveston-Houston Metropolitan District and all the vicariates and deaneries and seminaries created by the Holy See within the Galveston-Houston Metropolitan District, to include St. Mary's Seminary in Houston, Texas.  Based on information and belief, the Archdiocese of Galveston-Houston is a Texas corporation and can be served with process by and through its current Archbishop, Cardinal Daniel N. DiNardo, at 1700 San Jacinto Street, Houston Texas 77002.

8.      Defendant Cardinal Daniel N. DiNardo is the current Archbishop of The Roman Catholic Church of the Archdiocese of Galveston-Houston (hereinafter "Cardinal DiNardo"). Cardinal DiNardo, his predecessors and successors, are duly appointed, employed and authorized by Defendant Holy See to oversee and control both a division (Archdiocese of Galveston-Houston) and an ecclesiastical metropolitan territory of vicariates and deaneries and seminaries (Galveston-Houston Metropolitan District), all within the Holy See's business and private enterprise.  Cardinal

DiNardo is Defendant Holy See's governing official of the Archdiocese and the district vicariates and deaneries and seminaries located within the Galveston-Houston Metropolitan District, to include Saint Mary's Seminary in Houston, Texas.  Cardinal DiNardo is a resident and citizen of the State of Texas and can be served with process at 1700 San Jacinto Street, Houston Texas 77002.

### III.  FACTUAL BACKGROUND

9.      At all times material herein, Reverend Phi Thanh Nguyen was a Roman Catholic seminarian educated, trained and certified for a vocation in the priesthood by Defendant Holy See and The Roman Catholic Diocese of Galveston-Houston (later re-designated by Holy See as The Roman Catholic Church of the Archdiocese of Galveston-Houston) and under their direct supervision, authority and control, particularly on the issue of child sex abuse.  At all times material herein, Reverend Phi Thanh Nguyen was and continues to be a priest and pastor, minister and counselor employed by the Diocese of Galveston-Houston and Defendant The Roman Catholic Church of the Archdiocese of Galveston-Houston, and under their direct supervision, authority and control, particularly on the issue of child sex abuse.

10.      Defendant Holy See is a sovereign nation and enters into treaties and conventions with other foreign states, including but not limited to the *Universal Declaration of Human Rights* and the *Convention on the Rights of the Child*.  Holy See maintains diplomatic relations with other foreign states, including the United States, and has observer status in the United Nations.  Defendant Holy See occupies its own sovereign territory located within the city of Rome, Italy.

11.      Defendant Holy See is a traditional monarchy where it holds all authority in the first instance and any authority held by others within the institution is delegated from the Holy See.  The Holy See has reaffirmed this in its book of rules and regulations, the Code of Canon Law: "The

4

Roman Pontiff ... has not only primacy of honor, but supreme and full power of jurisdiction over the universal Church both in those things that pertain to faith and morals, and in those things that affect the discipline and government of the Church." (Canon 218 from the 1917 Code)

12.     Defendant Holy See is the composite of the authority, jurisdiction, and sovereignty vested in the Pope and his delegated advisors and/or agents to direct the activities and business of the world-wide Roman Catholic Church.  Defendant Holy See has unqualified power and control over the Catholic Church, including each and every individual and section of the Church, including but not limited to all clerics and priests, bishops, archbishops, and cardinals, and all other Church workers, as well as the ecclesiastical provinces, dioceses, and archdioceses and seminaries.

13.     Defendant Holy See directs, supervises, supports, promotes and engages in the oversight of the sovereign nation, the organization, and its employees for the purpose of the business, foreign affairs, and employees of the world-wide Roman Catholic Church, and provides religious and pastoral guidance, education and counseling to Roman Catholics world-wide in exchange for all or a portion of the revenues collected from its members.  The Holy See engages in these activities through its agents who work under the authority of the Holy See —namely the cardinals, archbishops, bishops, and clergy of the Roman Catholic Church.

14.     Defendant Holy See has complete and total control, including day-to-day control, over each aspect of the Catholic Church.  To the extent that some of the entities underneath the Holy See's absolute control are separate corporations or organizations —e.g., Defendant Archdiocese and it's charity organization, Defendant Holy See maintains complete and final control over these separate corporations and organizations.  The Holy See directs and requires each of these entities to strictly follow all of its policies and procedures, report its activities to the Holy See, and requires

each cleric employed with the separate corporation or organizations to swear absolute obedience to the Holy See.  Defendant Holy See is the only entity that can create or terminate these corporations and organizations and Holy See has day to day control of these entities through mandatory policies and procedures, mandatory meetings, and mandatory obedience.  Any corporations or organizations, including Defendant Archdiocese, were and are an alter ego of the Holy See.

15.    With respect to the issue of child sex abuse, the Holy See demands complete and unwavering obedience regarding procedures, the scope of potential penalties, and how each case will be disposed of ultimately.  Additionally, Defendant Holy See determined that it would require some of the entities under its control to incorporate in order to reduce the Holy See's exposure to claims by people who the Holy See has harmed and in order to keep the public from discovering the Holy See's involvement in the systematic cover-up and concealment of child sex abuse by its agents.

16.    Defendant Holy See's organizational structure and chain of command mandate that the Holy See and its head of state, the Pope, have a significantly high level of involvement in the routine and day-to-day activities of its agents, cardinals, archbishops, bishops, clergy and instrumentalities, particularly with respect to the handling of clergy who have engaged in certain specified conduct, including child sex abuse.  By virtue of his office, the Pope, as head of the Holy See, possesses supreme, full, immediate and universal ordinary power in the Catholic Church, which he is always able to exercise freely.  There is no appeal of a decision of the Pope as head of the Holy See.

17.    Defendant Holy See is solely responsible for creating new divisions of its business enterprises and private activities (called an "ecclesiastical province" or "diocese" or "archdiocese") around the world.  Only the Holy See has this power.  Defendant Holy See created all the

ecclesiastical provinces and dioceses and archdioceses in Texas, including The Texas Province -formed in 1839, The Diocese of Galveston -founded in 1847 to serve the State of Texas and re-designated in 1959 to Diocese of Galveston-Houston to serve Galveston and Houston and the surrounding areas, and The Archdiocese of Galveston-Houston -established in 2004.  Holy See creates, divides and re-aligns dioceses, archdioceses and ecclesiastical provinces.  Holy See is solely responsible for any modifications or elimination of the divisions and districts of its business enterprise.

18.     Defendant Holy See interacts with its local divisions and districts (its ecclesiastical provinces and dioceses and archdioceses) and employees in the United States and elsewhere in a manner that controls their day-to-day operations and provides for no discretion on numerous issues, and in particular the handling of child sex abuse by clergy and the determinations on whether clergy remain in the Roman Catholic ministry.  Defendant Holy See requires its duly appointed employees, including those cardinals and archbishops and bishops in the United States in charge of the local operations of the Roman Catholic ministry, to make "Ad Limina" visits to Rome and to write detailed "quinquennial reports" about the state of the Roman Catholic ministry, including but not limited to personnel issues, finances and real estate holdings.  Defendant Holy See further requires information on the source of the income of pastors and their supervisors, i.e., whether it is from real estate, public funds, an uncertified sum accruing through individual stole fees, or from a contribution made by the Catholic faithful or by the diocese.

19.     The Holy See routinely promulgates its policies through various means including encyclical, canon law, and Papal pronouncements.  Defendant Holy See promulgates and enforces the laws and regulations regarding the education, training and standards of conduct and discipline

for the clergy who serve in the educational and pastoral workings of the world-wide Catholic Church.  The "proper and exclusive right" to train those destined for the sacred ministries in the Catholic Church is affirmed in Holy See's Code of Canon Law.  (Canon 232 from the 1983 Code)  The training of sacred ministers as a private activity of the Holy See was decreed by the Council of Trent (1563) to take place in seminaries that would be erected in all of the Holy See's local provinces, where the appointed governing official for the local territory could recommend "candidates for the priesthood".  In 1901, to serve the Texas Province, the Holy See founded St. Mary's Seminary in La Porte, Texas for the education of men to become priests of the Roman Catholic Church with the day-to-day operations delegated to the Diocese of Galveston, followed by the Diocese of Galveston-Houston and its successor entity, the Archdiocese of Galveston-Houston, and its duly appointed bishops and archbishops.  With the passage of time, seminaries continue to be the object of the Holy See's concern where jurisdiction over the seminaries has been reserved and assigned to the institutional departments of the Holy See in order to provide a universal character for the establishment, governance, discipline, nomination of rectors, administration of property, and the studies of the seminaries.

20.     The Second Vatican Council (1962-1965) re-affirmed the critical importance of "priestly training" as a private activity of the Holy See and solemnly embraced the notion that "the destiny of the Church is closely bound" to its seminaries.  The "Decree on the Training of Priests" from the Second Council makes it clear that the Holy See is "fully aware that the desired renewal of the whole Church depends upon a priestly ministry."  Through it's norms and directives for seminaries, the Holy See maintains direct involvement with the "formation of clerics" and the details of the complete training to be imparted to future ministers of the Roman Catholic Church.

8

Defendant Holy See oversees and controls the admissions requirements and curricula to ensure that "candidates to the priesthood" are properly prepared to minister and serve the Catholic faithful.

21.     The Vatican sets all of the certification rules for becoming a priest.  These rules dictate who can administer the process, who can be made a priest, who is barred from the priesthood, how the ceremony is to be conducted when someone becomes a priest, and how to document the process.  Defendant Holy See directly and definitely controls the standards, morals, and obligations of the clergy of the Roman Catholic Church by and through its agents and instrumentalities, including the Congregation for the Clergy and the Congregation for Religious both delegated by the Pope and acting on his behalf and under his authority.  Holy See mandates the morals and standards of conduct of all clergy of the Roman Catholic Church by enforcement of the Code of Canon Law written and promulgated by Defendant Holy See and used as the employee manual for clergy.

22.     Once certified as a Roman Catholic clergyman, all clergy and priests agree and vow to show respect and obedience to Defendant Holy See, the Pope and their bishop and/or archbishop. A priest receives financial support throughout the full length of his life, and he may not be deprived of his pension or his clerical status unless the Holy See approves.

23.     The Holy See has complete and final control over each bishop, archbishop, cardinal, priest and cleric within the Catholic Church.  Holy See has the final and sole power to remove individual clergy and no priest, bishop, archbishop, cardinal or cleric may be removed from service or position of leadership without the approval of Defendant Holy See; nor can any priest, bishop, archbishop, cardinal or cleric remain in service or a position of leadership over the objection of Defendant Holy See.  By issuing instructions, mandates and dictates in the United States, Defendant Holy See is also directly and solely responsible for removing bishops, archbishops and cardinals

9

from service and/or making them ineligible for positions of leadership in the various local divisions and offices of the Roman Catholic Church.

24.     Defendant Holy See creates, appoints, assigns, reassigns and retires all clerics in the order of bishop.  Holy See exercises the power to directly assign and remove individual priests and deacons through the archbishops and bishops that the Holy See appoints to govern and control the archdioceses and dioceses, respectfully.  Defendant Holy See also examines and is responsible for the work and discipline and all things which concern archbishops, bishops, priests and clerics.  In furtherance of this duty, Defendant Holy See requires archbishops and bishops to file a report, on a regular basis, outlining the status of and any problems with clergy.

25.     In 1962, the Holy See issued "Instruction on the Manner of Proceeding in Cases of Solicitation" ("1962 Instructions") to all archbishops, bishops, and other diocesan ordinaries, which contains mandatory and specific instructions on the handling of child sex abuse by clergy "ordering upon those to whom it pertains to keep and observe it in the minutest detail".  Moreover, at all times material herein, the Defendant Holy See mandated the highest level of secrecy for all those involved in handling allegations of sexual abuse, to include its agents duly appointed as archbishops to govern and control the Galveston-Houston Metropolitan District and the Archdiocese, Joseph Fiorenza (duly appointed from 2004- 2006) and Cardinal Daniel DiNardo (duly appointed from 2006- present) and its agents duly appointed as bishops of the Diocese of Galveston-Houston, Wendelin Nold (duly appointed from 1950- 1975), John Morkovsky (duly appointed from 1975- 1985), and Joseph Fiorenza (duly appointed from 1985- 2004).  The policies of the Holy See expressed in the 1962 Instructions and in other documents require bishops and archbishops in the United States to, among

other things, refuse to report childhood sexual abuse committed by Catholic priests to criminal or civil authorities, even where such failure to report would itself be a criminal offense.

26.     Upon information and belief, in 1997, the Diocese of Galveston-Houston by and through its duly appointed Bishop Fiorenza recruited and admitted Phi Thanh Nguyen to St. Mary's Seminary where the Diocese and Bishop Fiorenza sponsored and supervised and controlled Phi Thanh Nguyen's education and training as a seminarian and "candidate to the priesthood," all according to Defendant Holy See's norms and requirements for "priestly training" of Roman Catholic Priests.

27.     In 2000, Defendant Holy See, by and through the Diocese of Galveston-Houston and its duly appointed Bishop Fiorenza, approved Phi Thanh Nguyen's "priestly training" from St. Mary's Seminary.  In May 2000, the Holy See authorized the Diocese of Galveston-Houston and Bishop Fiorenza to certify Phi Thanh Nguyen for the ministry as a Roman Catholic Priest.  Bishop Fiorenza conducted Phi Thanh Nguyen's ordination where Reverend Phi Thanh Nguyen agreed to be obedient to his Bishop, Bishop Fiorenza, and the Holy See (the Pope).

28.     Qualified and cloaked with the Holy See's certification for the Roman Catholic ministry and ordination by and through the Diocese of Galveston-Houston and its duly appointed Bishop Fiorenza, the Diocese of Galveston-Houston and Defendant Archdiocese accepted, employed and assigned Father Phi as a Roman Catholic Priest, pastor, minister and counsel entrusted with the care of souls.  From 2001 to 2003 Father Phi was employed as a Diocesan Priest and Parochial Vicar at St. Vincent de Paul Church, a parish in the Archdiocese of Galveston-Houston in Houston, Texas. From 2003 to 2005, Father Phi was employed as a Diocesan Priest and Assistant Pastor at St. Lawrence Church, a parish in the Archdiocese of Galveston-Houston in Sugarland, Texas.  In 2005,

the Archdiocese reported Phi's assignment status as "Leave of Absence." From 2006 to 2008, the Archdiocese re-assigned Father Phi to St. Vincent de Paul Church in Houston, Texas. From 2008 to 2009, the Archdiocese assigned Father Phi as Administrator at St. Anthony of Padua, a parish in the Archdiocese of Galveston-Houston in Danbury, Texas. In 2010, Father Phi was employed as the Parochial Vicar at Christ Our Light, a parish in the Archdiocese of Galveston-Houston in Navasota, Texas. From 2011 to 2018, the Archdiocese reports Father Phi's assignment status as "On Duty Outside of the Archdiocese" as "Chaplain, Convent, Sisters of Incarnate Word and Blessed Sacrament" in the Diocese of Victoria in Victoria, Texas.

29.     Plaintiffs allege that on or about November 20, 2018, Reverend Phi Thanh Nguyen engaged in inappropriate sexual contact as a Diocesan Priest with the Archdiocese of Galveston-Houston when he sexually assaulted, abused and exploited JANE DOE. During the time-frame of the sexual assault alleged herein, Father Phi was employed and assigned by Defendants Archdiocese and Cardinal DiNardo to work as a priest in the Diocese of Victoria in Victoria, Texas. Father Phi was, therefore, a duly recognized vice-principal, an employee, agent and/or an ostensible agent of Defendant Archdiocese when he sexually assaulted JANE DOE. The Archdiocese, through Cardinal DiNardo, granted priestly faculties to Father Phi, endorsing him to serve as a priest in the Diocese of Victoria where JANE DOE lived and where she was a student at Nazareth Academy. At time of the sexual assault alleged herein, the Diocese of Victoria had assigned Phi to serve and work for the Sisters of Incarnate Word and Blessed Sacrament as the school chaplain at Nazareth Academy where Phi was in charge of educating and training young parishioners (children) in the Catholic doctrines and traditions and the required rites of passage for becoming a legitimate member of the Roman Catholic Church. As an official Catholic Priest and Chaplain employed and assigned to work in the

Diocese of Victoria by the Archdiocese, Father Phi was subject to the continuing oversight and authority of the Archdiocese and was, therefore, its agent and/or ostensible agent.

30.     D.P., the father of JANE DOE, was raised as a devout Roman Catholic. D.P.'s family devoted thousands of volunteer hours and contributed regular tithings to the Catholic Church.  D.P. was baptized and confirmed in the Roman Catholic faith and was taught to believe and to rely upon the religious doctrines of the Catholic Church for moral and spiritual guidance and to rely on Catholic priests and archbishops and bishops as role models and mentors who were the embodiment of God and who could do no wrong.  Given D.P.'s family's Roman Catholic structure, Plaintiffs developed great trust, confidence, reverence, respect and obedience to the Roman Catholic Church and its Holy Fathers.  Therefore, D.P. and JANE DOE's mother, A.P, entrusted their daughter to Catholic Schools.  In March, 2018, D.P. and A.P. enrolled JANE DOE in Nazareth Academy, a Catholic school operated by the Sisters of the Incarnate Word and Blessed Sacrament and located within the Diocese of Victoria.

31.     As loyal Catholics, D.P. and A.P. trusted that the Roman Catholic Church, its servants and official representatives, its priests, archbishops and bishops, to include Defendant Archdiocese and its officials, Defendant Cardinal Daniel N. DiNardo, his predecessors and successors (Bishop Joseph Fiorenza) and other official representatives like Father Phi, would always act as they held themselves out to be, namely: holy and chaste men with honor and integrity, acting in the best interest of Plaintiffs, with confidence that they would never expose JANE DOE or any other children to any known danger, especially sexual predation.  Plaintiffs trusted and expected all Defendants herein would act in their behalf with the highest degree of trust, confidence, honesty, good faith and loyalty.

13

32.     Father Phi, under the guise of confession at Nazareth Academy in Victoria, Texas, sexually assaulted JANE DOE  by using his hands and fingers to touch her genitals underneath her skort and underwear and place his fingers in her vagina.  She had just turned ten years old barely a month earlier.

33.     Plaintiffs would show the Court that the proximate cause of Father Phi's access to JANE DOE was his education, training and certification for the Roman Catholic ministry at the Holy See's St. Mary's Seminary, all sponsored and controlled by the Diocese and its duly appointed bishop according to the Holy See's rules and norms for priestly training.  As a Catholic Priest ordained by the Holy See through the Diocese and its duly appointed Bishop Fiorenza, Father Phi was then authorized to work and carry out the mission of the Roman Catholic Church in the Diocese and later the Archdiocese of Galveston-Houston.  In Phi's position and assignment as a Roman Catholic diocesan priest and pastor with the Diocese and Archdiocese, Phi was a vice-principal, employee, agent and servant of the Diocese, the Holy See and the Archdiocese.  Based on Phi's status as an agent of the Diocese, the Holy See and the Archdiocese, Phi's own knowledge of his own vile sexual propensities to rape, molest, abuse and exploit children is imputed to the Diocese, the Holy See and the Archdiocese.  Plaintiffs have dealt with these Defendants in good faith and believed Father Phi was acting in the scope of his employment.

34.     JANE DOE'S sexual abuse and exploitation arose from the exercise of authority, power and access created by Reverend Phi Thanh Nguyen's job assignments and official duties as a Catholic priest under the supervision and control of the Archdiocese and its duly appointed Archbishop, who qualified, certified, authorized and assigned Phi to work and serve as a chaplain in and for the Diocese of Victoria, Sisters of the Incarnate Word and the Blessed Sacrement and

14

Nazareth Academy.  Moreover, this sexual assault, abuse and exploitation arose from the exercise of authority, power and access created by Phi's job assignments and official duties as a Catholic priest and chaplain for the Sisters of Incarnate Word and Blessed Sacrament and Nazareth Academy and the Diocese of Victoria.  Defendants Archdiocese and DiNardo knew or should have known of Father Phi's dangerous sexual propensities against vulnerable children, yet the Archdiocese and DiNardo did nothing to terminate Father Phi's authority and power as a Roman Catholic priest or to remove him from his position and job assignments with access to children or to control and supervise Phi's access to the children he sexually abused as a result of his official duties and job assignments as a school chaplain.  Phi molested and sexually abused and exploited JANE DOE as a result of his official duties and job assignments as a Catholic seminarian and cleric, priest and chaplain.

35.     During the many occasions when Defendant Holy See and its agents, the Diocese and its duly appointed bishops, the Archdiocese and its duly appointed archbishops and DiNardo knew or should have known of Phi's dangerous sexual propensities, Defendant Holy See, the Diocese and its duly appointed bishops, the Archdiocese and its duly appointed archbishops and DiNardo never reported the matter to law enforcement, as required by Texas' mandatory reporting laws and under customary international laws of human rights.  Instead, in keeping with their institutional pattern and practice of covering-up, Holy See and the Diocese and Bishop Fiorenza qualified and certified, ordained and authorized Defendant Father Phi to work and serve as a Catholic cleric and priest with the Diocese and later Archdiocese, the Diocese of Victoria, the Sisters of Incarnate Word and Blessed Sacrament and the Nazareth Academy, allowing Phi to continue to have unfettered access to children as a Diocesan Priest.

15

36.     Well before Phi was ordained a priest in 2000, the governing officials of the Catholic Church, including the Diocese and Bishop Fiorenza, knew its Catholic clerics were sexually assaulting and otherwise sexually exploiting minors.  Moreover, in accord with the Holy See's 1962 Instructions, the Diocese and Bishop Fiorenza and Defendants Archdiocese and Cardinal DiNardo covered up the information about Father Phi's acts of sexual misconduct involving vulnerable persons in the Galveston-Houston Metropolitan District and failed to disclose the information to Plaintiffs and the public or the authorities, while continuing to represent Father Phi as a priest, "an episcopal vicar" with high moral character, when in fact he was not.  Furthermore, in accord with the Holy See's 1962 Instructions, the Archdiocese and its duly appointed archbishops, including Fiorenza and Defendant DiNardo concealed their knowledge about the injuries other victims were suffering and failed to disclose this knowledge to Plaintiffs or the public or the authorities.

37.     All Defendants held themselves out as counselors and instructors on matters that were spiritual, moral and ethical.  By maintaining and encouraging such a relationship with Plaintiffs, all Defendants herein were in a confidential or fiduciary relationship with the Plaintiffs, grounded upon the duty of good faith and fair dealing and the duty to act with the highest degree of trust and confidence and loyalty. As a result of Plaintiffs' confidence and trust in Defendants, Defendants gained superiority, power and influence over Plaintiffs.  The fiduciary relationship of confidence and trust imposes on the Defendants the duty and obligation to render full and fair disclosure to Plaintiffs of all facts that materially affect Plaintiffs' rights, safety and interests. This fiduciary relationship includes the duty to disclose and to act to protect JANE DOE and other children from molestation, exploitation and sexual abuse by Catholic Priests and clerics, like Father Phi, whom Defendants represented, not just to the Catholic community, but to the public, as being sexually safe, celibate,

16

chaste and holy and otherwise sexually safe ("suitable") to be among children of either sex. Defendants, moreover, had a duty not to protect, harbor or conceal criminal conduct like Father Phi's from law enforcement and JANE DOE's parents, D.P. and A.P., especially since Father Phi was a foreseeable sexual risk to children and other vulnerable persons.

38.     Specifically, Defendants had a duty under customary international laws of human rights, but failed to report scores of cases of "AGGRAVATED RAPE" under Tex. Penal Code §22.03 (since repealed), "SEXUAL ABUSE" under Tex. Penal Code §21.04 (since repealed), "AGGRAVATED SEXUAL ABUSE" under Tex. Penal Code §21.05 (since repealed), "SEXUAL ABUSE OF A CHILD" under Tex. Penal Code §21.10 (since repealed), "PUBLIC LEWDNESS" under Tex. Penal Code §21.07, "SEXUAL EXPLOITATION BY MENTAL HEALTH SERVICES PROVIDER" under Tex. Penal Code §21.14 (since deleted), "UNLAWFUL DISCLOSURE OR PROMOTION OF INTIMATE VISUAL MATERIAL" under Tex. Penal Code §21.16, "AGGRAVATED SEXUAL ASSAULT" under Tex. Penal Code §22.021, "INDECENT EXPOSURE" under Tex. Penal Code §21.08, "INDECENCY WITH A CHILD" under Tex. Penal Code §21.11, "CONTINUOUS SEXUAL ABUSE OF YOUNG CHILD OR CHILDREN" under Tex. Penal Code §21.02, "SEXUAL ASSAULT" under Tex. Penal Code §22.011, and "INJURY TO A CHILD" under Tex Penal Code §22.04.  Defendants Holy See and the Archdiocese and its duly appointed archbishops, including Defendant Cardinal DiNardo and the Diocese and Bishop Fiorenza further failed to report the illegal sexual abuse of children by other Catholic priests and clerics as required by law in Texas in the 1980's and through the present time.  It was not until January 2019 that the Archdiocese published the identities of clerics accused of rape, sexual assault, sexual abuse and sexual exploitation, where the identities had been kept secret for many decades.

39.     As a direct result of the sexual abuse and exploitation by Reverend Phi Thanh Nugyen and the acts and omissions and cover-up by all Defendants pleaded herein, JANE DOE will suffer life-long, permanent injuries and damages, as more fully set forth below.

### IV.  CIVIL CONSPIRACY (PATTERN AND PRACTICE  OF COVER- UP OF CLERGY SEXUAL ABUSE OF CHILDREN)

40.     The problem of childhood sexual abuse committed by Roman Catholic clergymen was first acknowledged by the Holy See in 306 A.D. at the Council of Elvira in Spain when the council passed formal legislation condemning sexual abuse by the clergy, including sexual abuse of boys.  This early law continues in the current 1983 version of the Code of Canon Law which expressly forbids priests and clerics from having sexual relations or relationships with children.  The Code of Canon Law is mandatory and must be obeyed by all dioceses, archdioceses, religious orders, appointed bishops and archbishops, superior generals and priests and clerics.  Both old and current laws demonstrate that Defendant Holy See and all of its members, agents and employees, including The Archdiocese of Galveston-Houston and its duly appointed archbishops, to include current Archbishop Cardinal Dinardo, and his predecessor Bishop Fiorenza, are well aware of the practices of childhood sexual abuse by Roman Catholic priests and clerics while serving and during the course of the Holy See's ministry.

41.     Plaintiffs allege that Defendant Holy See has established exclusive policies and standards that dictate how sexual abuse of children by clergymen of the Holy See will be handled. In 1922, the Holy See released a confidential document regarding cases of solicitation of sex, which mandated a specific procedure for the Holy See's agents to use when a cleric or priest solicited sex from a child while in and during the course of the Holy See's ministry and the document required strict secrecy.  Under the Holy See's 1962 Instructions- an official legislative text issued by the

Congregation of the Holy Office and specifically approved by Pope John XXIII- penalties for the crime of solicitation include an order to move offending priests to other locations once they have been determined to be "delinquent."  Defendant Holy See created and maintained this policy of complete secrecy and transfers, even if that secrecy violated state, federal or international law, threatening all involved with ex-communication and thus, damnation, if they do not comply. According to the 1962 Instructions, once these non-discretionary penalties are levied, only the Holy See has the power to alter or remit the punishment.

42.     In 1963, a report from a Catholic religious order in the U.S.A. to Pope Paul VI (1963- 1978) communicated that "problems that arise from abnormal, homosexual tendencies are going to call for, not only spiritual, but understanding psychiatric counseling."  This same report, which concluded that pedophiles were unrepentant, manipulative and dangerous and should be removed from the priesthood because they could not be cured, had been delivered to bishops and archbishops in the U.S. for the previous 10 years.  At this point in modern times, the Holy See and its agents and duly appointed employees knew it had a widespread problem of Catholic clergy molesting minors.

43.     In response to repeated warnings that Catholic pedophile clerics and priests were dangerous and should be removed from the ministry, the Holy See authorized and created facilities in the U.S.A. where "priests ... who have been addicted to abnormal practices, especially sins with the young...." would be sent for short periods rather than "given the alternative of a retired life within the protection of monastery walls or complete laicization." Beginning in the 1960's, a large network of private Catholic owned and operated psychiatric treatment centers and hospitals was established across the United States solely for the treatment of Catholic Clerics and Priests upon referral by their bishops and archbishops and superior generals.  These treatment centers have treated Clerics and

19

Priests exhibiting psychosexual disorders of pedophilia and ephebophilia.  The treatment center operated by the Servants of the Paraclete, a Catholic religious order in New Mexico, was established in 1977 and was the first such treatment center in the world, secular or religious, to have an established residential healthcare program for the treatment of pedophilia and ephebophilia.  This center evaluated and treated over 1,000 cleric and priest perpetrators, who the Catholic order referred to as "guests", from 1976-1995.  The Shalom Center, founded in 1980, in Splendora, Texas was well-known among Texas bishops as another such residential treatment facility for evaluating and treating Catholic clerics and priests experiencing "a variety of issues" including sexual additions stemming from pedophilia and other inappropriate sexual behaviors.

44.     Plaintiffs allege that at least by the mid 1960's, the Catholic superior generals, bishops and archbishops of the United States and Bishop Wendelin Nold of the Diocese of Galveston-Houston were well aware of the illegal sexual abuse of children by Catholic Clerics and Priests and of the state statutes requiring the reporting of sex crimes against children.  These superior generals and bishops and archbishops and Bishop Nold were also aware that Catholic Clerics and Priests gained access to these children as the direct result of their status and responsibilities as Clerics and Priests who, as spiritual advisors and role models, exercised tremendous power over these children and their families.

45.     By 1999, the government of Ireland began investigating the sexual abuse of minors by clergy.  Ireland's published conclusions include: the Catholic Church had a systemic problem of numerous clergy sexually abusing children; cases of sexual abuse were managed within the institution of the Church with a view to minimizing the risk of public disclosure and consequent damage to the institution; the offenses were not reported to the police because of a culture of silence

20

about the issue; the recidivist nature of sexual abuse was well known to authorities within the institution; the Church authorities knew that the sexually abusing clergy were often long-term offenders who repeatedly abused children; when confronted with evidence of sexual abuse, a standard response of the religious authorities was to transfer the offender to another location https://assets.documentcloud.org/documents/243712/4-murphy-report-entire-ireland.pdf (last viewed July 6, 2021).

46.    In Catholic Dioceses and Archdioceses throughout the United States, to include The Diocese of Galveston-Houston and Archdiocese of Galveston-Houston, when cases of illegal rape and molestation and sexual abuse and exploitation of minors by Catholic Clerics and Priests have surfaced, these cases have been handled in such a uniform fashion as to demonstrate a common plan and scheme for concealing these crimes from the public, failing to report the crimes and thus avoiding criminal prosecution of cleric and priest perpetrators and the filing of civil claims by victims by covering the claims up.  This common plan and scheme was in existence before JANE DOE was sexually abused and exploited and was followed to conceal the crimes against children by Clerics and Priests in the Holy See's ministry, including the Clerics and Priests in the Province of Texas and specifically, the Archdiocese of Galveston-Houston and The Diocese of Galveston-Houston.  The members of this common plan and scheme included Holy See and its official representatives and agents and the official representatives and agents of The Archdiocese of Galveston-Houston, its duly appointed archbishops, to include Archbishops Fiorenza, Cardinal Dinardo and Father Phi, and others unknown to Plaintiffs.

47.    The Defendants herein were aware of the harm to Plaintiffs and the wrongful conduct of Father Phi at the beginning of the combination or agreement.  These Defendants intended to

accomplish the unlawful purpose of concealing sex abuse against children by Phi and other Clerics and Priests and/or intended to conceal their breach of duty by the unlawful means of failing to report Phi and other known perpetrators as required by Texas' mandatory reporting laws and the customary international laws of human rights. These Defendants knowingly caused further injury to Plaintiff JANE DOE and other children as a result of failing to report sexual abuse and exploitation. This combination had the result of concealing sexual abuse of children by fraudulent and illegal means. Acts in furtherance of this civil conspiracy were committed prior to November, 2018.

48. The elements of a "civil conspiracy" have therefore been met by the actions of the Holy See, the Archdiocese and Archbishops Fiorenza and Cardinal DiNardo as follows: (1) the combination consists of two or more persons; (2) the combination desires to either accomplish an unlawful purpose (concealing the rape and molestation and sexual abuse and exploitation of children by failing to report said abuse) and/or to accomplish a lawful purpose by unlawful means (concealing their breach of duty by failing to report said rape and molestation and sexual abuse and exploitation); (3) there is a meeting of the minds on the object or course of action; (4) there are numerous unlawful, overt acts, i.e., i) the numerous separate instances of illegal sexual misconduct and ii) the failure to report the numerous separate instances of suspected child abuse and exploitation as required by Texas' mandatory reporting statutes and customary international laws of human rights; and (5) damages to the victims as the proximate result.

49. All Defendants participated in coordinating the action, including the Holy See, the Archdiocese, Bishop Nold, and Archbishops Fiorenza and Cardinal DiNardo, which resulted in the use of fraud and misrepresentation. This series of events was carried out as part of the civil conspiracy pled herein to keep the rape, molestation, sexual abuse and exploitation of children a

secret, and avoid the prosecution of cleric and priest perpetrators. False representations were used to prevent the public from knowing of this high-profile case. Efforts to conceal this combination are on-going and have included the unlawful failure to report Phi to the proper authorities and the failure to confirm the identify other pedophile-priests until January 2019.

## V.  CAUSES OF ACTION AGAINST THE ARCHDIOCESE AND DINARDO

50.     Defendant Archdiocese of Galveston-Houston, to include its predecessor, the Diocese of Galveston-Houston and Defendant Cardinal Daniel N. Dinardo and his predecessor, Bishop Fiorenza negligently endorsed, selected, supervised and retained Reverend Phi Thanh Nguyen and assigned him to a position of trust, confidence, and authority in the Diocese of Victoria, including as a cleric and chaplain, and as a mentor, confessor and counselor in direct contact with children. Defendants Archdiocese and Cardinal DiNardo knew or should have known Father Phi was sexually dangerous to minors and grossly unsuited for such assignments. These Defendants negligently entrusted and exposed minors, including Plaintiff JANE DOE and other minors, to Phi's care, counseling, control and predation.

51.     Defendants were negligent in recruiting, endorsing, selecting, assigning, supervising and retaining Phi and negligent in allowing him to minister and counsel youngsters when they knew or should have known of his perverse and predatory sexual nature.

52.     Defendants Archdiocese and Cardinal DiNardo negligently failed to provide reasonable monitoring and supervision of Father Phi. Defendant DiNardo retained overall responsibility for all aspects of religious life in the Archdiocese, including the following duties: (a) to inquire and investigate Phi before granting him permission to serve in the Diocese of Victoria in direct contact with children; (b) to supervise, evaluate, monitor, inspect and oversee all activities of

23

Phi; (c) to investigate, monitor and supervise Phi as a cleric in the Archdiocese of Galveston-Houston; and (d) to terminate Phi's assignment upon repeated and documented notice that he was decidedly unsuited and dangerous for the positions he was assigned. Defendants Archdiocese and DiNardo were negligent in relation to each of these duties. Had they not been negligent, Phi would never have had the means and opportunity to sexually abuse and exploit JANE DOE.

53.     Defendants Archdiocese and Cardinal DiNardo negligently failed to warn Plaintiffs, or the other parents at Nazareth Academy in Victoria, Texas or the public that Phi had the propensity to molest children, despite their knowledge and notice of these propensities.

54.     Defendants Archdiocese and DiNardo negligently failed to implement reasonable policies and procedures that could detect and prevent the sexual abuse of minors by Father Phi even though Defendants knew or should have known Phi was a foreseeable risk for such sexual abuse and sexual misconduct. The negligent acts arising out of Defendants' policies and practices include, but are not limited to:

a.  recruiting, endorsing, selecting, supervising, reassigning, and retaining clerics known to have abused minors, including Phi;

b.  failing to inform parishioners and the public that such clerics assigned to their parishes were sexual threats;

c.  ignoring warnings from medical professionals even within the Catholic Church that certain clerics were potentially sexually dangerous to children;

d.  misrepresenting facts to victims who requested information about such clerics in order to fraudulently conceal the Archdiocese's own negligence in order to avoid scandal;

e.  failing to warn or alert parishioners/parents, previous parishes and the surrounding

24

communities where abusive priests had served that they were exposed to known or suspected child molesters;

f.  ignoring warnings from others within the Archdioceses and Bishops Conference who believed that such clerics were threats to children;

g.  failing to report the crimes committed by such clerics to the public or to law enforcement and obstructing or interfering with law enforcement's investigations concerning abusive priests;

h.  making decisions which reflected that the interests of abusive clerics and the desire to avoid scandal to the Church were vastly superior and more important than the interests of persons, particularly parishioners, who had been abused by such clerics;

i.  using Church influence and conspiring with others to alter the outcome of the criminal legal process relating to priests who had been engaging in illegal sexual acts in order to avoid liability and accountability to civil authorities and their victims and then to recycle them back into active ministry elsewhere;

j. fostering an environment and culture where abuse of children could flourish and in which it was clearly understood that there was no accountability for criminal acts toward children;

k.  failing to employ priests who would not tolerate sexual misconduct and would act against it, or at the very least, failing to train priests on how to spot red flags and to intervene to prevent the sexual abuse of children;

l.  failing to prevent the sexual abuse, sexual assault and sexual exploitation by their employee, Phi, and

m.  committing other acts of negligence and omission.

55.     Plaintiffs allege that Defendants Roman Catholic Archdiocese of Galveston-Houston and DiNardo are liable for the acts and/or omissions of Reverend Phi Thanh Nguyen under the legal doctrine of negligent assumption of the risk of intentional or criminal conduct.   Defendants Archdiocese and DiNardo realized or should have realized that Reverend Phi Thanh Nguyen posed an unreasonable risk of harm to minors, including JANE DOE.  Plaintiffs thus plead Section 302B of the Restatement (Second) of Torts.

56.     At all relevant times, Defendants Archdiocese and DiNardo aided and abetted or were accessories before and after the fact in assisting Phi Thanh Nguyen in becoming a Catholic priest in the first place and then later giving him priestly faculties to work in the Diocese of Victoria. Therefore, Defendants Archdiocese and DiNardo have joint and several participatory liability for the actions of Father Phi Thanh Nguyen.

57.     At all relevant times, Reverend Phi Thanh Nguyen was an employee and/or agent of the Archdiocese acting in the course and scope of his employment or agency such that the Archdiocese is liable for the conduct of its employees and/or agents.  Reverend Phi Thanh Nguyen, engaged in assault, sexual assault and sexual exploitation of JANE DOE as the Archdiocese's agent and/or vice-principal and was aided and abetted by Defendants Archdiocese and DiNardo before and after the fact, thus ratifying Reverend Phi Thanh Nguyen's conduct by failing to stop him.

58.     Plaintiffs also allege that Defendants Archdiocese and Dinardo failed to apprise Plaintiffs and the local communities of Father Phi's sexually deviant and predatory nature.  Thus, the Archdiocese's representation that Phi was not sexually dangerous to youngsters placed JANE DOE and other children at Nazareth Academy and other parishes in peril.  Plaintiffs plead that Defendants Archdiocese and DiNardo failed to exercise reasonable care and thus negligently

misrepresented and negligently gave false information with the intent to mislead, which proximately caused harm to the Plaintiffs, who reasonably relied upon the knowingly false representation that Reverend Phi Thanh Nguyen was suitable for a position involving access to minors.  Plaintiffs thus plead Section 311 of the Restatement (Second) of Torts and the legal doctrine of negligent misrepresentation involving the risk of physical harm.

59.    The sexual assault, sexual abuse and sexual exploitation of JANE DOE arose from Father Phi's *imprimatur* of authority and power, and access to victims and their families created by his position and employment as a Catholic priest and counselor in good standing with Defendant Archdiocese.  Plaintiffs thus plead vicarious liability under the doctrine of *Respondeat Superior* in that Defendants Archdiocese and DiNardo knew or should have known of the dangerous propensities of Father Phi and that his injurious sexual actions were foreseeable and thus preventable.  Because Defendants Archdiocese and DiNardo's authority over their priests exceeds the customary employer/employee relationship, Defendant Archdiocese is vicariously liable for all actions of Phi as described above.

60.    The Archdiocese and Cardinal DiNardo's conduct at the time and on the occasions in question, and continuing through the present day, resulted in the intentional infliction of emotional distress upon Plaintiffs.

61.    Defendants actively and constructively stated and/or represented numerous falsehoods, including purporting that Father Phi was a man of good moral character, a holy man who could be entrusted with the care, counseling, teaching, and instruction of children.  These representations, among others outlined in this pleading, were false, untrue and misleading and were known to be false, untrue and misleading at the time they were made, or were made with a reckless

disregard as to whether they were true or false or for their potential consequences to the laity of Galveston-Houston Archdiocese and in particular these Plaintiffs. These falsehoods and non-disclosures were material facts made with the intent to deceive and to induce reliance.

62.     The actions of the Defendants Archdiocese and Cardinal DiNardo pled in paragraphs 50 - 61 proximately caused the incidents in question and the damages sustained by Plaintiffs.

## VI.  CAUSE OF ACTION AGAINST DEFENDANT HOLY SEE

63.     Defendant Holy See has specifically carved out the treatment of child sex abuse by clergy from other disciplinary matters to have continuing control over this issue, and governs it every day and perpetually according to the non-negotiable and mandatory standards. Under Defendant Holy See's policy on sexual abuse of children, the Holy See mandates certain procedures and absolute secrecy by all involved under penalty of immediate removal from the organization (excommunication), retains the power at all times to conduct the inquisition of the case itself, and admits no deviations from its mandate. Through its mandated policies and its agents and employees and instrumentalities, Holy See is an integral part of the day-to-day handling of cases of child sex abuse by clergy. There is no discretion given to its agents and employees in the handling of such cases.

64.     Defendant Holy See has known that child sex abusers have a very high rate of recidivism and are likely to abuse more children. As such, Holy See knew that children, parents and guardians who did not possess Holy See's knowledge about its clergymen and former clergymen and who unsuspectingly were around those clergymen and former clergymen were at a high risk to be sexually exploited and abused. Moreover, because of the high rate of recidivism, Defendant Holy See's clergymen and former clergymen had probably already sexually exploited and abused

numerous children.  Defendant Holy See knew there were many victims out there who were hurt because of Defendant Holy See's policies of secrecy, concealment and self-protection.  Children are at risk because the public and law enforcement do not know the identity and the locations of these clergymen and former clergymen of Defendant Holy See who have been accused of sexual misconduct.

65.     Upon information and belief, Defendant Holy See did not report all allegations of child sex abuse by its clergymen and former clergymen to law enforcement, or to those directly in the path of danger, or the public.  Further Defendant Holy See adopted a policy and practice where its agents and employees were not to report abuse by Holy See's clergymen to law enforcement, or to those directly in the path of danger, or the public.  Plaintiffs were harmed as a result of Defendant Holy See's practice and policy of not reporting suspected child abuse to law enforcement officials and requiring secrecy of all its agents and employees who received reports of abuse.

66.     At all times material hereto, Defendant Holy See directed its archbishops and bishops in the United States to conceal from its parishioners and the general public the sexual abuse of children committed by its priests and clerics and candidates to the priesthood.  To shield itself from "scandal" in the United States in 2002, Defendant Holy See denied approval of key provisions adopted by the U.S. Conference of Catholic Bishops that would have required Holy See's agents and archbishops and bishops in the United States to report all known or suspected child abuse to the civil authorities.  Defendant Holy See also refused to give U.S. archbishops and bishops the power to remove abusive priests and clerics from the ministry.  While the "public" policy of Defendant Holy See is to forbid childhood sexual abuse by priests and clerics within its control, the actual "private" or secret policy is to harbor and protect its abusive priests and clerics and candidates to the

priesthood from public disclosure and prosecution.  Whether explicit or implicit, the transmission and receipt of these "public" and "private" or secret policies, directives and orders on childhood sexual abuse by the clergy are the actions of Defendant Holy See and its agents and employees that occurred in the U.S.A.  Plaintiff JANE DOE, a minor, was sexually abused and exploited by Father Phi, one of Defendant Holy See's clerics and clergymen.  Defendant Holy See's directives to conceal the sexual abuse of children committed by its clerics and clergymen to maximize revenue and image by avoiding scandal was a substantial factor in bringing about JANE DOE's abuse.  Plaintiffs thus plead vicarious liability under the doctrine of respondeat superior.  At all times material herein, the Holy See's authority over its bishops and archbishops exceeds the customary employer/employee relationship, thus the Holy See is vicariously liable for all actions of its actual agents and employees, the duly appointed archbishops of the Archdiocese and the duly appointed bishops of the Diocese of Galveston-Houston.

67.     Defendant Holy See's policy of secrecy under penalty of ex-communication for all involved in an accusation against the clergy or clerics for the crime of solicitation - which includes sexual abuse of a minor - insulated Father Phi from consequences.  Through this policy of secrecy, the Holy See knowingly allowed and permitted and encouraged child sex abuse by its clerics and priests, including Father Phi.

68.     The practices, instructions, mandates and dictates of Defendant Holy See in the United States prohibiting the disclosure of the identity and existence of pedophiles and sexual predators among its clerics and priests and candidates to the priesthood under its control and placing children in a position of harm and peril, whether undertaken under the color of law or only in its

capacity as a private actor, are a gross violation of established, universally recognized norms of international law of human rights.

69.     The worldwide acceptance of various international agreements, including the *Convention on the Rights of the Child*, demonstrates that some of their provisions have attained the status of customary international law.   In 1990 Holy See signed the *Convention on the Rights of the Child,* which provides "in all actions concerning children ... the best interests of the child shall be a primary consideration," Art. 3; that the signatories "shall take all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical or mental violence, injury or abuse, ..., including sexual abuse," Art. 19; and that signatories "undertake to protect the child from all forms of sexual exploitation and sexual abuse," Art. 34.   These provisions in the *Convention on the Rights of the Child* and the provisions in the *Universal Declaration of Human Rights* signed by Holy See in 1948 codify longstanding legal human rights norms that reflect actual practices of states in prohibiting childhood sexual abuse and are not so novel as to be considered outside the bounds of what is customary, but are of universal concern. Violations of these customary international law of human rights and crimes which the law of nations attributes individual responsibility have been codified in these various international agreements, include but are not limited to:

a. the *Universal Declaration of Human Rights* in that Defendant Holy See, as a matter of policy, at all times practiced, ignored, tolerated, disregarded, permitted, allowed, condoned or failed to report childhood sexual abuse which the international community and the civilized world views as cruel, inhumane and degrading; and

b. the *Convention on the Rights of the Child*, in that Defendant Holy See, among other things, did not make the interests of minor children in its control its primary responsibility; did not conform to international standards for the safety and health of these children in considering the suitability and fitness of its priests and clerics and "candidates to the priesthood"; did not take all appropriate legislative, administrative, social and educational measures to protect these children from sexual abuse; did not prevent, identify, report, investigate, treat or follow-up on instances of childhood sexual abuse of which it had knowledge; did not take all appropriate measures to ensure that school discipline was administered in a manner consistent with human dignity; and did not undertake to protect these children from sexual exploitation and abuse.

70.     Defendant Holy See, by and through its agents and employees, breached duties owed to Plaintiffs under the common law of the states, the federal common law, the laws of the fifty states, the laws of Texas and customary international law of human rights, including but not limited to:

a. The duty to provide safe care, custody and control of the minor children entrusted by their parents to the Roman Catholic churches and schools under the absolute control of Holy See.

b. The duty to warn parents, who entrusted their children's care, custody and control to the churches and schools of the Roman Catholic Church, that priests and other clerics were known pedophiles, sexual predators and perpetrators of childhood sexual abuse.

c. The duty to warn parents and children of a dangerous condition on Holy See's premises.

d. The duty to provide reasonable admission and certification guidelines for candidates for the priesthood to prevent sexual abuse.

e. The duty to not retain or certify seminarians for the priesthood that presented an unreasonable risk of harming others.

32

f. The duty to report known or suspected perpetrators of childhood sexual abuse to authorities as required by statutory law, common law, and customary international law.

71.     Defendant Holy See knew that its priests and clerics in the United States, and more specifically in the state of Texas, were committing acts of childhood sexual abuse and engaging in dangerous and exploitive conduct as pedophiles, sexual predators and perpetrators of childhood sexual abuse, and that these priests and clerics created an unsafe condition on the premises of the churches and schools occupied and run by the Archdiocese and its duly appointed archbishops and the Diocese of Galveston-Houston and its duly appointed bishops, to whom the custody and control of minor children was placed.

72.     The acts and omissions of Defendant Holy See, including the concealment of its policy of harboring and protecting its abusive priests and clerics, and "candidates for the priesthood" from public disclosure and prosecution and directives prohibiting the reporting of child sexual abuse to authorities, as part of a regular course of commercial conduct and particular commercial transactions and acts, constitutes an act or acts of concealment or obstructive conduct under Texas and federal statutory law, common law and customary international law.

73.     A special legal relationship existed between Plaintiffs and Defendant Holy See, in the nature of a fiduciary relationship, which relationship was carried out by and through priests, clerics and administrators under the direct and absolute control of Defendant Holy See, in their capacity as paid educators and/or counselors and recruiters of minor children in the private schools of the Roman Catholic Church in the United States.  The Defendant Holy See breached fiduciary duties owed to Plaintiffs under the common law of the states, the federal common law, the laws of the fifty states, including Texas and customary international law of human rights, including but not limited to:

33

a. The duty to warn parents, who entrusted their children's care, custody and control to the churches and schools of the Roman Catholic Church, that its priests and clerics in those churches and schools were known pedophiles, sexual predators and perpetrators of childhood sexual abuse.

b. The duty to report known or suspected perpetrators of childhood sexual abuse to authorities as required by statutory law, common law, and customary international law.

c. A duty to provide a reasonably safe environment at its institutions.

d. A duty to mandate safe policies and procedures for its institutions.

74.     Holy See knew that Father Phi had a history of sexually abusing and exploiting children and was a danger to children before Father Phi abused and exploited JANE DOE.  Whether or not Phi had a history of sexual abuse was a material fact to Plaintiffs and Plaintiffs relied on this non-disclosure.  Holy See intentionally did not disclose this fact to the Plaintiffs in order to induce them to act on the misrepresentation to their detriment.  Plaintiffs relied upon this intentional non-disclosure.

75.     Defendant Holy See, through its agents the Archdiocese and the Diocese of Galveston-Houston, represented to Plaintiffs that Father Phi did not have a history of sexually abusing and exploiting children and that Father Phi was not a danger to children.  Holy See owed a duty of care to Plaintiffs because it knew or should have known that Father Phi was a danger to children and should have known that parents and children would place the utmost trust in Father Phi.  Holy See, through its agents the Archdiocese and the Diocese of Galveston-Houston, failed to use ordinary care in making the representations or in ascertaining the facts related to Father Phi's history of sexually abusing and exploiting children.  Holy See reasonably should have foreseen that its

34

representations would subject Plaintiffs to an unreasonable risk of harm.  Plaintiffs believed and justifiably relied upon Holy See's representations.

76.     The actions of Defendant Holy See alleged herein in  Paragraphs 63 - 75 proximately caused the incidents in question and the damages sustained by Plaintiffs.

## VII.  CAUSES OF ACTION AGAINST DEFENDANTS HOLY SEE AND THE ARCHDIOCESE AND ARCHBISHOP CARDINAL DINARDO

77.     These Defendants have a fiduciary relationship with and a fiduciary duty to Plaintiffs. Specifically, as youth serving organizations, Defendants were under a duty to protect minors from harm, including sexual harm, when D.P. and A.P. entrusted JANE DOE to the Catholic Church's care.  This fiduciary relationship gives rise to the duty on the part of these Defendants to act with the highest degree of trust and confidence and loyalty towards Plaintiffs.  Defendants breached their fiduciary duty to Plaintiffs. This breach of fiduciary duty includes the duty to warn and disclose.

78.     Defendants have been negligent in their actions and have violated their duty to exercise reasonable care to protect Plaintiffs from the foreseeable risk of child rape, molestation and sexual abuse and exploitation by Father Phi.

79.     Plaintiffs allege that the actions of these Defendants have been outrageous and have intentionally inflicted emotional distress upon Plaintiffs.

80.     Plaintiffs also allege that all Defendants acted in concert and are jointly and severally liable for all acts and/or omissions under the legal doctrine of concert of action as joint venturers, and as agents of these entities as these concepts are understood and provided for under Section 876 of the Restatement (Second) of Torts.  Thus, Plaintiffs seek damages from all Defendants, jointly and severally.

81.     The actions of Defendants alleged herein in  Paragraphs 77 - 80 proximately caused the incidents in question and the damages sustained by Plaintiffs.

## VIII.   DAMAGES, GROSS NEGLIGENCE AND PUNITIVE DAMAGES

### A.  Plaintiffs D.P. and A.P., Individually

82.     As a result of the conduct and incidents described herein, the parents of JANE DOE have (a) incurred medical expenses for severe physical, emotional and psychological pain and suffering in the past and in all reasonable probability, will continue to incur medical expenses on their daughter, JANE DOE's, behalf for severe physical, emotional and psychological pain and suffering in the future.

### B.  Plaintiffs D.P. and A.P., As Next Friends of JANE DOE, A Minor

83.     As a result of the conduct and incidents described herein, Plaintiff JANE DOE (a) in all reasonable probability, after she reaches the age of majority will continue to incur medical expenses for severe physical, emotional and psychological pain and suffering in the future; (b) has suffered mental anguish in the past and in all reasonable probability will sustain mental anguish in the future; (c) has suffered physical impairment damages in the past and in all reasonable medical probability will suffer physical impairment damages in the future; and (d) in all reasonably probability will suffer a diminished wage-earning capacity for the future.

84.     As a result of the above, Plaintiffs seek actual damages in the amount of $10,000,000.00.

### C.  Gross Negligence and Punitive Damages

85.     Rape, especially of children, is considered heinous and utterly repugnant in civilized countries.  Rape cannot be tolerated in this country, particularly by institutions that are granted

36

special exemptions for purported "religious" youth-serving organizations. Yet, Defendants Holy See and the Archdiocese and the Holy See's duly appointed governing officials of the Diocese and later Archdiocese, including Defendant Cardinal DiNardo, knew or should have known that Phi Thanh Nguyen had the propensity to molest children but continued to recruit, promote and endorse Phi Thanh Nguyen as well as aiding and abetting him to become a priest and work as a priest in the Diocese and Archdiocese of Galveston-Houston. Therefore, Defendants acted with heedless and reckless disregard for the safety of JANE DOE and other children. Plaintiffs therefore seek punitive and exemplary damages in order to punish and deter the outrageous and unconscionable conduct of the Defendants whose professed mission is the care and salvation of the souls of the faithful. Plaintiffs will prove by clear and convincing evidence that Defendants acted fraudulently and maliciously and were grossly negligent in that, either by act or omission, Defendants exposed Plaintiffs to an extreme degree of risk of harm, considering the probability, magnitude and extent of the harm that would likely impact Plaintiffs and which ultimately and consequently did. Further, Defendants had a real, subjective awareness of the risks involved, but nevertheless proceeded with callous indifference to violate the rights, safety, and welfare of Plaintiffs. These damages, in concert with Father Phi's conduct —that constitutes felonies under Tex. Pen. Code §§ 21.11 (Indecency with a Child) and 22.011 (Sexual Assault) were committed knowingly by Defendants. Therefore, the punitive damage cap does not apply. *See* Tex. Civ. Prac. & Rem. Code § 41.008(c).

86.    To the extent that this case arises out of criminal conduct committed by Father Phi, an unfit employee or and/or agent of the Defendants, Defendants are liable for exemplary damages because the agent was notably and notoriously unfit; Defendants acted with malice in recruiting, endorsing and sponsoring Phi and/or in failing to supervise him; the employee, agent, and/or dual

agent was employed in a managerial capacity and was acting in the scope of employment; and/or Defendants effectively aided and abetted and/or ratified or approved his acts.

87.     Tex. Civ. Prac. & Rem. Code § 1.005(a) does not apply to bar punitive damages in this matter because the Defendants were criminally complicit.  Tex. Civ. Prac. & Rem. Code § 41.005(b)(2) provides an exception when a Defendant is criminally responsible as a party to the criminal act.  Under Chapter 7 of the Texas Penal Code, specifically § 7.02(a), a person is criminally responsible for an offense committed by the conduct of another if:

    (1)    acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; or

    (2)    having a legal duty to prevent the commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent the commission of the offense.

Tex. Pen. Code Ann. § 7.02(a)(2). The provisions of this statute are met because Defendant Archdiocese aided and abetted Father Phi in the commission of the sexual abuse and sexual assault of JANE DOE.

88.     Further, the statutory requirements under Tex. Pen. Code Ann. § 7.02(a)(3) are met because Defendants had a duty to prevent the sexual assault of JANE DOE and other minors and vulnerable persons but did not.

89.     Additionally, Tex. Pen Code Ann. § 7.21-7.23 encompasses the criminal responsibility of corporations or associations and provides that a corporation or association is criminally responsible for the conduct of its agent if it was authorized, performed, or recklessly tolerated by a high managerial agent.  The hierarchy of the Holy See, its divisions and districts and duly appointed governing officials, not only tolerated Father Phi's conduct, but Plaintiffs would

show that Defendants recklessly tolerated and allowed Father Phi's conduct and are therefore subject to punitive damages.

### IX.   CLAIMS FOR PRE-JUDGMENT AND POST-JUDGEMENT INTEREST

90.     Plaintiffs claim pre-judgement and post judgment interest in accordance with 28 U.S.C. § 1961 and any other applicable law.

### X.   STATEMENTS TO THE COURT

91.     Plaintiffs allege that these Defendants have acted in concert in keeping with its corporate pattern and practice of fraudulently concealing their predatory clerics by recycling them, concealing the extent and nature of cleric sexual abuse and concealing the harmful effects of such abuse.

92.     Plaintiffs invoke the open-courts provision of the Texas Constitution, Article 1 § 13.

93.     Plaintiffs assert that all Defendants are jointly and severally liable for their negligent misrepresentations involving risk of physical harm under the legal doctrine of concert of action, as joint venturers, and as agents of these entities pursuant to Section 876 of the Restatement (Second) of Torts.

FOR THE REASONS STATED ABOVE, Plaintiffs pray that all Defendants named herein be served and cited to appear and answer herein and that upon final judgment of this cause, Plaintiffs have judgment against Defendants, jointly and severally, for a sum of money for damages described herein, for attorneys' fees, for cost of suit, for interest from the date of the incidents and for such other relief to which Plaintiffs may be justly entitled.

**RESPECTFULLY SUBMITTED,**

**FELECIA Y. PEAVY, ESQ.**

By: /S/ Felecia Y. Peavy
    Felecia Y. Peavy, Attorney-in-Charge
    Federal ID No. 13530
    Texas Bar No. 15698820
    P.O. Box 3464
    Houston, Texas 77253
    (713) 222-0205
    felepeavy@juno.com

**TAHIRA KHAN MERRITT, P.L.L.C.**

By: /S/ Tahira Khan Merritt
    Tahira Khan Merritt
    Federal ID No. 17525
    Texas Bar No. 11375550
    8499 Greenville Ave., Suite 206
    Dallas, Texas 75231
    (214)503-7300
    (214)503-7301(FAX)
    tahira@tkmlawfirm.com

**ATTORNEYS FOR PLAINTIFFS**